John J. Nelson (SBN 317598)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, LLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
Telephone: (858) 209-6941
Email: jnelson@milberg.com

*Attorney for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Hopelyn Ferguson, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>EP Global Production Solutions, LLC d/b/a Entertainment Partners,<br><br>Defendant. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Hopelyn Ferguson ("Plaintiff") brings this Class Action Complaint ("Complaint") against Defendant EP Global Production Solutions, LLC d/b/a Entertainment Partners ("Entertainment Partners" or "Defendant") as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge

as to her own actions and her counsels' investigation, and upon information and belief as to all other matters, as follows:

## **NATURE OF THE ACTION**

1.      This class action arises out of the recent cyberattack and data breach ("Data Breach") resulting from Entertainment Partners' failure to implement reasonable and industry standard data security practices.

2.      Defendant provides "production tools and services" to "tens of thousands of productions" within the entertainment industry.[1] As part of those services, Defendant provides payroll solutions, software solutions for management and enterprise purposes, and data and analytics services.

3.      Plaintiff's and Class Members' sensitive personal information—which they entrusted to Defendant on the mutual understanding that Defendant would protect it against disclosure—was compromised and unlawfully accessed due to the Data Breach.

4.      Entertainment Partners collected and maintained certain personally identifiable information of Plaintiff and the putative Class Members (defined below), who are (or were) employees at Entertainment Partners and/or production companies that contracted with Entertainment Partners for services.

---

[1]  https://www.ep.com/company/about-us/ (last visited Aug. 16, 2023).

5.      The PII compromised in the Data Breach included Plaintiff's and Class Members' full names, addresses, email, Social Security numbers, and tax identification numbers ("personally identifiable information" or "PII").

6.      The PII compromised in the Data Breach was exfiltrated by cyber-criminals and remains in the hands of those cyber-criminals who target PII for its value to identity thieves.

7.      As a result of the Data Breach, Plaintiff and approximately 470,000 Class Members,[2] suffered concrete injuries in fact including, but not limited to: (i) Plaintiff's PII being disseminated on the dark web; (ii) an increase in spam calls, texts, and/or emails; (iii) lost or diminished value of their PII; (iv) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (v) invasion of privacy; (vi) loss of benefit of the bargain; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

8.      The Data Breach was a direct result of Defendant's failure to

---

[2] https://apps.web.maine.gov/online/aeviewer/ME/40/6dd29d7e-9e44-4ad0-9d48-1e0bd6122ab6.shtml (last visited Aug. 16, 2023).

implement adequate and reasonable cyber-security procedures and protocols necessary to protect its employees' and/or its clients' employees' PII from a foreseeable and preventable cyber-attack.

9. Defendant maintained the PII in a reckless manner. In particular, the PII was maintained on Defendant's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' PII was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the PII from those risks left that property in a dangerous condition.

10. Defendant disregarded the rights of Plaintiff and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that they did not have adequately robust computer systems and security practices to safeguard Class Members' PII; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

11. Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct because the PII that Defendant collected and

maintained is now in the hands of data thieves.

12.     Armed with the PII accessed in the Data Breach, data thieves have already engaged in identity theft and fraud and can in the future commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

13.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

14.     Plaintiff and Class Members may also incur out of pocket costs, *e.g.*, for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

15.     Plaintiff brings this class action lawsuit on behalf all those similarly situated to address Defendant's inadequate safeguarding of Class Members' PII that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject

to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

16.    Through this Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose PII was accessed during the Data Breach.

17.    Plaintiff seeks remedies including, but not limited to, compensatory damages and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

## PARTIES

18.    Plaintiff, Hopelyn Ferguson, is a natural person and resident of Los Angeles, California, where she intends to remain.

19.    Defendant is a Delaware limited liability company with its principal place of business located at 2950 North Hollywood Way, Burbank, California 91505.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are

more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.[3]

21.    This Court has personal jurisdiction over Defendant because its principal place of business is in this District, regularly conducts business in California, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

22.    Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

## **FACTUAL ALLEGATIONS**

### ***Defendant's Business***

23.    Defendant provides "production tools and services" to "tens of thousands of productions" within the entertainment industry.[4]

24.    Plaintiff and Class Members are current and former employees of Entertainment Partners and/or production companies that contracted with Entertainment Partners for services.

25.    The information held by Defendant in its computer systems at the time of the Data Breach included the unencrypted PII of Plaintiff and Class Members.

---

[3] According to the report submitted to the Office of the Maine Attorney General, 287 Maine residents were impacted in the Data Breach. *See* https://apps.web.maine.gov/online/aeviewer/ME/40/6dd29d7e-9e44-4ad0-9d48-1e0bd6122ab6.shtml (last visited Aug. 16, 2023).

[4]  https://www.ep.com/company/about-us/ (last visited Aug. 16, 2023).

26.    Upon information and belief, in the course of collecting PII from employees, including Plaintiff, Defendant promised to provide confidentiality and adequate security for data through its applicable privacy notice and through other disclosures in compliance with statutory privacy requirements.

27.    Indeed, Defendant's Privacy Notice provides that: "[w]e use commercially reasonable technical, organizational, and administrative measures to protect our Websites, Online Services, Payroll Services and Casting Services against unauthorized or unlawful access and against accidental loss, theft, disclosure, copying, modification, and destruction, or damage."[5]

28.    Plaintiff and Class Members provided their PII to Defendant, directly or indirectly, with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

29.    Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiff and Class Members relied on the sophistication of Defendant to keep their PII confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members value the confidentiality of their PII and demand security to safeguard their PII.

---

[5] https://www.ep.com/legal/privacy-notice/ (last visited Aug. 16, 2023).

30.     Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep the PII it maintains as safe and confidential.

31.     Defendant had obligations created by FTC Act, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

32.     Defendant derived a substantial economic benefit from collecting Plaintiff's and Class Members' PII. Without the required submission of PII, Defendant could not perform the services it provides.

33.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

### *The Data Breach*

34.     On or about July 31, 2023, Defendant began sending Plaintiff and other Data Breach victims a Notice of Security Breach letter (the "Notice Letter"), informing them that:

> **What Happened?** On the morning (Pacific Time) of Friday, June 30, 2023, we detected suspicious activity within a limited area of our computer network that supports a subset of our accounting applications. We promptly took the applications offline, notified law enforcement, and engaged industry-leading cybersecurity experts to investigate. Over the course of the following few weeks, we determined that a sophisticated threat actor evaded

our cybersecurity defenses and acquired database files containing your personal information. We have recovered the database files.

**What Are We Doing?** We are continuing to work with federal law enforcement and our cybersecurity experts. We have restored the applications. We will continue to prioritize additional investments in our cybersecurity defenses. We will continue to monitor online forums and marketplaces for any information relating to this event; we have found none to date.

**What Information Was Involved?** The database files included your name, mailing address, social security number and/or tax identification number in connection with prior productions on which you worked. Please note that your compensation information was not affected.[6]

35.     Omitted from the Notice Letter were the dates of the Data Breach, the dates of Defendant's investigation, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their PII remains protected.

36.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

---

[6] The "Notice Letter". A sample copy is available at https://apps.web.maine.gov/online/aeviewer/ME/40/6dd29d7e-9e44-4ad0-9d48-1e0bd6122ab6.shtml (last visited Aug. 16, 2023).

37.    Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

38.    The attacker accessed and acquired files Defendant shared with a third party containing unencrypted PII of Plaintiff and Class Members, including their Social Security numbers and other sensitive information. Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

39.    Plaintiff has already been informed that her PII has been disseminated on the dark web, and Plaintiff further believes that the PII of Class Members was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

**Data Breaches Are Preventable**

40.    Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PII.

41.    Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

42.    To prevent and detect cyber-attacks and/or ransomware attacks
Defendant could and should have implemented, as recommended by the United
States Government, the following measures:

- Implement an awareness and training program. Because end users are
targets, individuals should be aware of the threat of ransomware and how
it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the
end users and authenticate inbound email using technologies like Sender
Policy Framework (SPF), Domain Message Authentication Reporting
and Conformance (DMARC), and DomainKeys Identified Mail (DKIM)
to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter
executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider
using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans
automatically.

- Manage the use of privileged accounts based on the principle of least
privilege: no users should be assigned administrative access unless
absolutely needed; and those with a need for administrator accounts
should only use them when necessary.

- Configure access controls—including file, directory, and network share
permissions—with least privilege in mind. If a user only needs to read
specific files, the user should not have write access to those files,
directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[7]

43.    To prevent and detect cyber-attacks or ransomware attacks Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

-    Apply latest security updates
-    Use threat and vulnerability management
-    Perform regular audit; remove privileged credentials;

---

[7] *Id.* at 3-4.

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[8]

44.    Given that Defendant was storing the PII of its current and former employees and/or its clients' current and former employees, Defendant could and

---

[8] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Nov. 11, 2021).

should have implemented all of the above measures to prevent and detect cyberattacks.

45.    The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and, upon information and belief, the exposure of the PII of over four hundred thousand employees, including that of Plaintiff and Class Members.

### *Defendant Acquires, Collects, And Stores Employees' PII*

46.    Defendant has historically acquired, collected, stored, and shared the PII of Plaintiff and Class Members.

47.    As a condition of employment, or as a condition of receiving certain benefits, Defendant requires that its' employees, its' clients' employees, and other personnel entrust it with highly sensitive personal information.

48.    By obtaining, collecting, sharing, and using Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

49.    Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.

50.    Defendant could have prevented this Data Breach by properly

securing and encrypting the files and file servers containing the PII of Plaintiff and Class Members or by exercising due diligence in selecting its IT vendors and properly auditing those vendor's security practices.

51.    Upon information and belief, Defendant made promises to Plaintiff and Class Members to maintain and protect their PII, demonstrating an understanding of the importance of securing PII.

52.    Indeed, Defendant's Privacy Notice provides that: "[w]e use commercially reasonable technical, organizational, and administrative measures to protect our Websites, Online Services, Payroll Services and Casting Services against unauthorized or unlawful access and against accidental loss, theft, disclosure, copying, modification, and destruction, or damage."[9]

53.    Plaintiff and the Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

***Defendant Knew or Should Have Known of the Risk Because Production Companies In Possession Of PII Are Particularly Suspectable To Cyber Attacks***

54.    Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting production companies that collect and store PII, like Defendant, preceding the date

---

[9] https://www.ep.com/legal/privacy-notice/ (last visited Aug. 16, 2023).

of the breach.

55.     Data breaches, including those perpetrated against production companies that store PII in their systems, have become widespread.

56.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[10]

57.     Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store PII are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[11]

58.     Defendant knew and understood unprotected or exposed PII in the custody of production companies, like Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that PII through unauthorized access.

59.     At all relevant times, Defendant knew, or reasonably should have

---

[10] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified.idtheftcenter.org/s/), at 6.
[11] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection (last accessed Oct. 17, 2022).

known, of the importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

60.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

61.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

62.    The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

63.    As a company in custody of significant amounts of confidential personal information, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to them by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach.

Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

### *Value Of Personally Identifiable Information*

64.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[12]

65.    The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[13]

66.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web.

67.    Numerous sources cite dark web pricing for stolen identity credentials.[14]

---

[12] 17 C.F.R. § 248.201 (2013).
[13] *Id.*
[14] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Oct. 17, 2022).

68.    For example, PII can be sold at a price ranging from $40 to $200.[15] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[16]

69.    PII can sell for as much as $363 per record according to the Infosec Institute.[17] PII is particularly valuable because criminals can use it to target victims with frauds and scams.

70.    Identity thieves use stolen PII such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

71.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in

---

[15] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Oct. 17, 2022).

[16] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Oct. 217, 2022).

[17] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited May 7, 2023).

an arrest warrant being issued in the victim's name.

72.    For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[18] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[19] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

73.    Moreover, it is not an easy task to change or cancel a stolen Social Security number:

> An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[20]

---

[18] *Identity Theft and Your Social Security Number*, Social Security Administration (2018). Available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited May 7, 2023).
[19] *Id.*
[20] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited May 7, 2023).

74.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

75.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[21]

76.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[22]

---

[21] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited Oct. 17, 2022).

[22] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited May 7, 2023).

77.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names, dates of birth, and PHI.

**_Defendant Fails To Comply With FTC Guidelines_**

78.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

79.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal employee information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[23]

---

[23] _Protecting Personal Information: A Guide for Business_, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Oct. 17, 2022).

80.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[24]

81.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

82.    The FTC has brought enforcement actions against production companies for failing to protect employee data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential employee data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

83.    These FTC enforcement actions include actions against production companies, like Defendant.

---

[24] *Id.*

84.    Defendant failed to properly implement basic data security practices.

85.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to employees' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

86.    Upon information and belief, Defendant was at all times fully aware of its obligation to protect the PII of its employees and its clients' employees. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### *Defendant Fails To Comply With Industry Standards*

87.    As noted above, experts studying cyber security routinely identify production companies in possession of PII as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

88.    Several best practices have been identified that, at a minimum, should be implemented by production companies in possession of PII, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

89.    Other best cybersecurity practices that are standard in the entertainment production industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

90.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

91.    These foregoing frameworks are existing and applicable industry standards in the entertainment production industry, and upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

***Defendant's Breach***

92.    Defendant breached its obligations to Plaintiff and Class Members
and/or was otherwise negligent and reckless by conducting the following acts
and/or omissions:

      a.  Failing to maintain an adequate data security system to reduce the risk
of data breaches and cyber-attacks;

      b.  Failing to adequately protect PII;

      c.  Failing to ensure the confidentiality and integrity of electronic PII it
created, received, maintained, and/or transmitted;

      d.  Failing to implement technical policies and procedures for electronic
information systems that maintain electronic PII to allow access only
to those persons or software programs that have been granted access
rights;

      e.  Failing to implement policies and procedures to prevent, detect,
contain, and correct security violations;

      f.  Failing to implement procedures to review records of information
system activity regularly, such as audit logs, access reports, and security
incident tracking reports;

      g.  Failing to protect against reasonably anticipated threats or hazards to
the security or integrity of electronic PII;

h.  Failing to train all members of their workforces effectively on the policies and procedures regarding PII;

i.  Failing to render the electronic PII it maintained unusable, unreadable, or indecipherable to unauthorized individuals;

j.  Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

k.  Failing to adhere to industry standards for cybersecurity as discussed above; and,

l.  Otherwise breaching their duties and obligations to protect Plaintiff's and Class Members' PII.

93.    Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' PII by allowing cyberthieves to access Defendant's online insurance application flow, which provided unauthorized actors with unsecured and unencrypted PII.

94.    Had Defendant remedied the deficiencies in its information storage and security systems or those of its vendors and affiliates, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

95.    Accordingly, as outlined below, Plaintiff and Class Members now face

a present, increased risk of fraud and identity theft. In addition, Plaintiff and the Class Members lost the benefit of the bargain they made with Defendant.

## COMMON INJURIES & DAMAGES

96.    As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their PII; (e) invasion of privacy; and (f) the continued risk to their PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

### *The Data Breach Increases Victims' Risk Of Identity Theft*

97.    Plaintiff and Class Members are at a heightened risk of identity theft for years to come.

98.    As Plaintiff has already experienced, the unencrypted PII of Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted PII may fall into the hands of companies that

will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

99.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

100.   Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity--or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

101.   For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

102.   One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[25]

103.   With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

104.   The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam

---

[25] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/ (last visited on May 26, 2023).

telemarketers) over and over.

105.    The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like phone numbers and emails) of Plaintiff and the other Class Members.

106.    Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

107.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

### *Loss Of Time To Mitigate Risk Of Identity Theft And Fraud*

108.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

109.    Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must, as Defendant's Notice Letter encourages, monitor their

financial accounts for many years to mitigate the risk of identity theft.

110.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter and researching the credit and identity theft monitoring services offered by Defendant.

111.    Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[26]

112.    Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[27]

---

[26] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[27] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited July 7, 2022).

### Diminution Value Of PII

113.   PII is a valuable property right.[28] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

114.   An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[29]

115.   In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[30,31]

116.   Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[32]

117.   Conversely sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.[33]

---

[28] *See, e.g.,* Randall T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[29] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[30] https://datacoup.com/

[31] https://digi.me/what-is-digime/

[32] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

[33] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Sep. 13, 2022).

118.   As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

119.   Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change, e.g., names, Social Security numbers, and dates of birth.

120.   Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

121.   The fraudulent activity resulting from the Data Breach may not come to light for years.

122.   At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members,

and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

123.   Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to over four hundred thousands individuals' detailed personal information, upon information and belief, and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

124.   The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

***Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary***

125.   Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII involved, the volume of data obtained in the Data Breach, and Plaintiff's PII already being disseminated on the dark web (as discussed below), there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes –*e.g.,* opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

126.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

127.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[34] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

128.    Consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

129.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to

---

[34] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

safeguard their PII.

### *Loss Of The Benefit Of The Bargain*

130.   Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When accepting employment from Defendant under certain terms, Plaintiff and other reasonable employees understood and expected that they were, in part, paying, or being paid less, for services and data security to protect the PII, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received employment positions that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

## **PLAINTIFF FERGUSON'S EXPERIENCE**

131.   Plaintiff Hopelyn Ferguson is an actress who has worked for at least one production company that contracted with Defendant for services.

132.   As a condition of her employment at a production company contracted with Defendant and/or to receive certain employee benefits, Plaintiff was required to provide her PII, directly or indirectly, to Defendant.

133.   Upon information and belief, at the time of the Data Breach, Defendant retained Plaintiff's PII in its system.

134.   Plaintiff Hopelyn Ferguson is very careful about sharing her sensitive PII. Plaintiff stores any documents containing her PII in a safe and secure location.

She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted her PII to Defendant had she known of Defendant's lax data security policies.

135.   Plaintiff Hopelyn Ferguson received the Notice Letter, by U.S. mail, directly from Defendant, dated July 31, 2023. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties, including her name, address, email, Social Security number and/or tax identification number.

136.   As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter and researching the credit and identity theft monitoring services offered by Defendant. Plaintiff has spent significant time dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

137.   Plaintiff suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) lost or diminished value of her PII; (ii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii)

invasion of privacy; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

138.   Plaintiff further suffered actual injury in the form of her PII being disseminated on the dark web, which, upon information and belief, was caused by the Data Breach.

139.   Plaintiff further suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

140.   The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

141.   As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

142.   As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

143.   Plaintiff Hopelyn Ferguson has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

144.   This action is properly maintainable as a class action. Plaintiff brings this class action on behalf of herself and on behalf of all others similarly situated.

145.   Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

**Nationwide Class**
All individuals residing in the United States whose PII was compromised in the data breach announced by Defendant in July 2023 (the "Class").

**California Subclass**
All individuals residing in the state of California whose PII was compromised in the data breach announced by Defendant in July 2023 (the "California Subclass").

146.   Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

147.   <u>Numerosity</u>: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. At least 470,000

individuals were notified by Defendant of the Data Breach, according to the breach report submitted to Office of the Maine Attorney General.[35] The Class is apparently identifiable within Defendant's records, and Defendant has already identified these individuals (as evidenced by sending them breach notification letters).

148.   Common questions of law and fact exist as to all members of the Class that predominate over any questions affecting solely individual members of the Class. The questions of law and fact common to the Class, which may affect individual Class members, include, but are not limited to, the following:

a.   Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;

b.   Whether Defendant had respective duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

c.   Whether Defendant had respective duties not to use the PII of Plaintiff and Class Members for non-business purposes;

d.   Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

e.   Whether and when Defendant actually learned of the Data Breach;

f.   Whether Defendant adequately, promptly, and accurately informed

---

[35] https://apps.web.maine.gov/online/aeviewer/ME/40/6dd29d7e-9e44-4ad0-9d48-1e0bd6122ab6.shtml (last visited Aug. 16, 2023).

Plaintiff and Class Members that their PII had been compromised;

g.. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct; and

k. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

149. <u>Typicality</u>: Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

150. <u>Policies Generally Applicable to the Class:</u> This class action is also appropriate for certification because Defendant acted or refused to act on grounds

generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Nationwide Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

151.  Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that she has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages she has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

152.  Superiority and Manageability: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense

that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

153.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

154.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant

manageability problems with prosecuting this lawsuit as a class action.

155. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

156. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

157. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Code of Civil Procedure § 382.

## COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

158. Plaintiff restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

159. Defendant required Plaintiff and Class Members to submit non-public PII, directly or indirectly, as a condition of employment or as a condition of receiving employee benefits.

160. Plaintiff and the Class Members entrusted their PII to Defendant with the understanding that Defendant would safeguard their information and delete it

once the employment relationship terminated.

161.   By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

162.   Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

163.   Section 5 of the FTC Act, as interpreted and enforced by the FTC, prohibits the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the members of the Class's sensitive PII.

164.   Plaintiff and members of the Class are within the class of persons that the FTC Act intended to protect.

165.   The harm that occurred as a result of the Data Breach is the type of harm that the FTC Act intended to guard against. The FTC has pursued enforcement actions against employers, which, as a result of failures to employ reasonable data

security measures and avoid unfair and deceptive practices, caused the same harm to its employees as that suffered by Plaintiff and members of the Class.

166.   Defendant's conduct constitutes negligence because it was in violation of Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards.

167.   Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of the Data Breach for companies of Defendant's magnitude, including, specifically, the immense damages that would result to Plaintiff and Members of the Class due to the valuable nature of the PII at issue in this case—including Social Security numbers.

168.   Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

169.   Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.   Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

    b.   Failing to adequately monitor the security of their networks and systems;

c.  Allowing unauthorized access to Class Members' PII;

d.  Failing to detect in a timely manner that Class Members' PII had been compromised;

e.  Failing to remove former employees' PII it was no longer required to retain pursuant to regulations,

f.  Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

g.  Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

170.  It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the entertainment production industry.

171.  It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

172.  There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the PII and the harm suffered, or risk of imminent harm suffered by Plaintiff and the Class.

173.  As a result of Defendant's negligence, Plaintiff and the Class Members

have suffered and will continue to suffer damages and injury including, but not limited to: (i) Plaintiff's PII being disseminated on the dark web; (ii) an increase in spam calls, texts, and/or emails; (iii) lost or diminished value of their PII; (iv) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (v) invasion of privacy; (vi) loss of benefit of the bargain; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

174.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

175.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### UNJUST ENRICHMENT / QUASI CONTRACT
### (On Behalf of Plaintiff and the Class)

176.    Plaintiff restates and realleges the preceding factual allegations set forth

above as if fully alleged herein.

177.    This Count is pleaded in the alternative to the breach of implied contract claim (Count II) above.

178.    Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of providing their valuable PII to Defendant.

179.    Plaintiff and Class Members provided Defendant their PII on the understanding that Defendant would pay for the administrative costs of reasonable data privacy and security practices and procedures from the revenue it derived therefrom. In exchange, Plaintiff and Class Members should have received adequate protection and data security for such PII held by Defendant.

180.    Defendant benefited from receiving Plaintiff's and Class Members' labor and from receiving their PII through its ability to retain and use that information for its own benefit. Defendant understood and accepted this benefit.

181.    Defendant knew Plaintiff and Class members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiff and Class Members for business purposes.

182.    Because all PII provided by Plaintiff and Class Members was similarly at risk from a foreseeable and targeted data breach, Defendant's obligation to safeguard the PII it collected from its employees and its clients' employees was inherent to the relationship.

183.   Defendant also understood and appreciated that Plaintiff's and Class Members' PII was private and confidential, and its value depended upon Defendant maintaining the privacy and confidentiality of that information.

184.   Defendant failed to provide reasonable security, safeguards, and protections to the PII of Plaintiff and Class Members.

185.   Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff' and Class Members' PII.

186.   Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead made calculated decisions to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

187.   Under the principles of equity and good conscience, Defendant should not be permitted to retain money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures mandated by industry standards.

188.   Defendant's enrichment at the expense of Plaintiff and Class Members is and was unjust.

189.   Defendant acquired the monetary benefit and PII through inequitable

means in that they failed to disclose the inadequate security practices previously alleged.

190.  If Plaintiff and Class Members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant.

191.  Plaintiff and Class Members have no adequate remedy at law.

192.  As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury as described herein.

193.  Plaintiff and the Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

**COUNT III**
**Violation of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §17200 *et seq.***
**(On Behalf of Plaintiff and the Class, or alternatively the California Subclass)**

194.  Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint, as if fully set forth herein.

195.  Defendant is a "person" defined by Cal. Bus. & Prof. Code § 17201.

196.  Defendant violated Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

197.  In the course of conducting its business, Defendant committed "unlawful" business practices by, inter alia, failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security

processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class Members' PII, and by violating the statutory and common law alleged herein, including, inter alia, the California Consumer Privacy Act of 2018 (Cal. Civ. Code § 1798.100, et seq.), Cal. Civil Code § 1798.81.5, Cal. Civ. Code § 1798.80 *et seq*., and Section 5 of the FTC Act. Plaintiff and Class Members reserve the right to allege other violations of law by Defendant constituting other unlawful business acts or practices. Defendant's above-described wrongful actions, inaction, and want of ordinary care are ongoing and continue to this date.

198.   Defendant also violated the UCL by failing to timely notify Plaintiff and Class members pursuant to Civil Code § 1798.82(a) regarding the unauthorized access and disclosure of their II. If Plaintiff and Class Members had been notified in an appropriate fashion, they could have taken precautions to safeguard and protect their PII and identities.

199.   Defendant violated the unfair prong of the UCL by establishing the sub-standard security practices and procedures described herein and storing Plaintiff's and Class Members' PII in an unsecure, internet accessible, electronic environment. Specific failures to follow industry standards and exercise reasonable care include: failing to encrypt the PII accessed during the Data Breach; maintaining customer PII for longer than it has a legitimate use; failing to regularly update passwords; failure

to implement two-factor authentication for access to accounts and systems containing PII; failing to adequately train employees to recognize phishing and other social engineering techniques; and failing to implement and use software that can adequately detect phishing emails. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and Class Members. The harm these practices caused to Plaintiff and Class Members outweighed their utility, if any.

200. Defendant's above-described wrongful actions, inaction, want of ordinary care, and practices also constitute "unfair" business acts and practices in violation of the UCL in that Defendant's wrongful conduct is substantially injurious to consumers, offends legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous. Defendant's practices are also contrary to legislatively declared and public policies that seek to protect PII and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws such as the CCPA, CRA, and the FTC Act (15 U.S.C. § 45). The gravity of Defendant's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendant's legitimate business interests other than engaging in the above-described wrongful conduct.

201. Defendant engaged in unfair business practices under the "balancing

test." The harm caused by Defendant's failure to implement proper data security measures, as described in detail above, greatly outweighs any perceived utility. Indeed, Defendant's failure to follow basic data security protocols cannot be said to have had any utility at all. All of these actions and omissions were clearly injurious to Plaintiff and Class Members, directly causing the harms alleged.

202. Defendant engaged in unfair business practices under the "tethering test." Defendant's failure to implement proper data security measures, as described in detail above, violated fundamental public policies expressed by the California Legislature. *See, e.g.*, Cal. Civ. Code § 1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern."). Defendant's acts and omissions thus amount to a violation of the law.

203. Defendant engaged in unfair business practices under the "FTC test." The harm caused by Defendant's failure to implement proper data security measures, as described in detail above, is substantial in that it affects thousands of Class

Members and has caused those persons to suffer actual harms. This harm continues given the fact that Plaintiff's and California Subclass members' PII remains in Defendant's possession, without adequate protection, and is also in the hands of those who obtained it without their consent. Defendant's actions and omissions violated Section 5(a) of the Federal Trade Commission Act. See 15 U.S.C. § 45(n) (defining "unfair acts or practices" as those that "cause[ ] or [are] likely to cause substantial injury to consumers which [are] not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition"); see also, e.g., In re LabMD, Inc., FTC Docket No. 9357, FTC File No. 102-3099 (July 28, 2016) (failure to employ reasonable and appropriate measures to secure personal information collected violated § 5(a) of FTC Act).

204.   As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Plaintiff and Class Members' were injured and lost money or property,  which would not have occurred but for the unfair and deceptive acts, practices, and omissions alleged herein, time and expenses related to monitoring their financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft, and loss of value and the right to control their personal information.

205.   Defendant's violations were, and are, willful, deceptive, unfair, and unconscionable.

206.    Plaintiff and California Subclass Members have lost money and property as a result of Defendant's conduct in violation of the UCL, as stated herein and above.

207.    By deceptively storing, collecting, and disclosing their personal information, Defendant has taken money or property from Plaintiff and California Subclass Members.

208.    Defendant acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiff's and Class Members' rights.

209.    Plaintiff and California Class Members seek all monetary and nonmonetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices or use of their personal information; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief, including public injunctive relief.

## COUNT IV
### Violation of the California Consumer Privacy Act,
### Cal. Civ. Code §§ 1798.100 *et seq.*, § 1798.150(a)
### (On Behalf of Plaintiff and the California Subclass)

210.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint, as if fully set forth herein.

211.    The California Consumer Privacy Act ("CCPA"), Cal. Civ. Code §

1798.150(a), creates a private cause of action for violations of the CCPA. Section 1798.150(a) specifically provides:

> Any consumer whose nonencrypted and nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5, is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for any of the following:

> > (A) To recover damages in an amount not less than one hundred dollars ($100) and not greater than seven hundred and fifty ($750) per consumer per incident or actual damages, whichever is greater.

> > (B) Injunctive or declaratory relief.

> > (C) Any other relief the court deems proper.

212. Defendant is a "business" under § 1798.140(b) in that it is a corporation organized for profit or financial benefit of its shareholders or other owners, with gross revenue in excess of $25 million.

213. Plaintiff and California Subclass Members are covered "consumers" under § 1798.140(g) in that they are natural persons who are California residents.

214. The personal information of Plaintiff and the California Subclass Members at issue in this lawsuit constitutes "personal information" under § 1798.150(a) and 1798.81.5, in that the personal information Defendant collects and which was impacted by the cybersecurity attack includes an individual's first name or first initial and the individual's last name in combination with one or more of the

following data elements, with either the name or the data elements not encrypted or redacted: (i) Social Security number; (ii) Driver's license number, California identification card number, tax identification number, passport number, military identification number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual; (iii) account number or credit or debit card number, in combination with any required security code, access code, or password that would permit access to an individual's financial account; (iv) medical information; (v) health insurance information; (vi) unique biometric data generated from measurements or technical analysis of human body characteristics, such as a fingerprint, retina, or iris image, used to authenticate a specific individual.

215. Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the California Subclass Members' personal information and that the risk of a data breach or theft was highly likely. Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information of Plaintiff and the California Subclass Members. Specifically, Defendant subjected Plaintiff's and the California Subclass Members' nonencrypted and nonredacted personal information to an unauthorized access and exfiltration, theft, or disclosure as a result of the Defendant's violation of the duty to implement

and maintain reasonable security procedures and practices appropriate to the nature of the information, as described herein.

216.   As a direct and proximate result of Defendant's violation of its duty, the unauthorized access and exfiltration, theft, or disclosure of Plaintiff's and California Subclass Members' personal information included exfiltration, theft, or disclosure through Defendant's servers, systems, and website, and/or the dark web, where hackers further disclosed the personal identifying information alleged herein.

217.   As a direct and proximate result of Defendant's acts, Plaintiff and the California Subclass Members were injured and lost money or property, including but not limited to the loss of Plaintiff's and California Subclass Members' legally protected interest in the confidentiality and privacy of their personal information, stress, fear, and anxiety, nominal damages, and additional losses described above.

218.   Section 1798.150(b) specifically provides that "[n]o [prefiling] notice shall be required prior to an individual consumer initiating an action solely for actual pecuniary damages."

219.   Accordingly, Plaintiff and the California Subclass Members by way of this complaint seek actual pecuniary damages suffered as a result of Defendant's violations described herein.

220.   Plaintiff provided Defendant with written notice of its violations of the CCPA, pursuant to Civil Code § 1798.150(b)(1). If Defendant fails to respond, or

has not cured or is unable to cure the violation within 30 days thereof, Plaintiff will amend this Complaint to seek all relief available under the CCPA including damages to be measured as the greater of actual damages or statutory damages in an amount up to seven hundred and fifty dollars ($750) per consumer per incident.  See Cal. Civ. Code § 1798.150(a)(1)(A) & (b).

## COUNT V
### Violation of the California Customer Records Act, Cal. Civ. Code §§ 1798.80 *et seq*. (On Behalf of Plaintiff and the California Subclass)

221.   Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint, as if fully set forth herein.

222.   Cal. Civ. Code § 1798.81.5 provides that "[i]t is the intent of the Legislature to ensure that personal information about California residents is protected. To that end, the purpose of this section is to encourage businesses that own, license, or maintain personal information about Californians to provide reasonable security for that information."

223.   Section 1798.81.5(b) further states that: "[a] business that owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

224.   Cal. Civ. Code § 1798.84(b) provides that [a]ny customer injured by a

violation of this title may institute a civil action to recover damages." Section 1798.84(e) further provides that "[a]ny business that violates, proposes to violate, or has violated this title may be enjoined."

225. Plaintiff and the California Subclass Members are "customers" within the meaning of Civ. Code § 1798.80(c) and 1798.84(b) because they are individuals who provided personal information to Defendant for the purpose of obtaining a product and/or service, via their employment with Defendant's clients, from Defendant.

226. The personal information of Plaintiff and the California Subclass Members at issue in this lawsuit constitutes "personal information" under § 1798.81.5(d)(1) in that the personal information Defendant collects and which was impacted by the cybersecurity attack includes an individual's first name or first initial and the individual's last name in combination with one or more of the following data elements, with either the name or the data elements not encrypted or redacted: (i) Social Security number; (ii) Driver's license number, California identification card number, tax identification number, passport number, military identification number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual; (iii) account number or credit or debit card number, in combination with any required security code, access code, or password that would permit access to an individual's financial

account; (iv) medical information; (v) health insurance information; (vi) unique biometric data generated from measurements or technical analysis of human body characteristics, such as a fingerprint, retina, or iris image, used to authenticate a specific individual.

227.   Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the Plaintiff's and California Subclass Members' personal information and that the risk of a data breach or theft was highly likely. Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information of Plaintiff and the California Subclass Members. Specifically, Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information of Plaintiff and the California Subclass Members from unauthorized access, destruction, use, modification, or disclosure. Defendant further subjected Plaintiff's and the California Subclass Members' nonencrypted and nonredacted personal information to an unauthorized access and exfiltration, theft, or disclosure as a result of the Defendant's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, as described herein.

228.   As a direct and proximate result of Defendant's violation of its duty,

the unauthorized access, destruction, use, modification, or disclosure of the personal information of Plaintiff and the California Subclass Members included hackers' access to, removal, deletion, destruction, use, modification, disabling, disclosure and/or conversion of the personal information of Plaintiff and the California Subclass Members by the cyber attackers and/or additional unauthorized third parties to whom those cybercriminals sold and/or otherwise transmitted the information.

229.   As a direct and proximate result of Defendant's acts or omissions, Plaintiff and the California Subclass Members were injured and lost money or property including, but not limited to, the loss of Plaintiff's and the California Subclass Members' legally protected interest in the confidentiality and privacy of their personal information, nominal damages, and additional losses described above. Plaintiff seeks compensatory damages as well as injunctive relief pursuant to Cal. Civ. Code § 1798.84(b).

230.   Moreover, the California Customer Records Act further provides: "A person or business that maintains computerized data that includes personal information that the person or business does not own shall notify the owner or licensee of the information of the breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82.

231.   Any person or business that is required to issue a security breach notification under the CRA must meet the following requirements under §1798.82(d):

    a.   The name and contact information of the reporting person or business subject to this section;

    b.   A list of the types of personal information that were or are reasonably believed to have been the subject of a breach;

    c.   If the information is possible to determine at the time the notice is provided, then any of the following:

        i.   the date of the breach,

        ii.   the estimated date of the breach, or

        iii.  the date range within which the breach occurred. The notification shall also include the date of the notice;

    d.   Whether notification was delayed as a result of a law enforcement investigation, if that information is possible to determine at the time the notice is provided;

    e.   A general description of the breach incident, if that information is possible to determine at the time the notice is provided;

    f.   The toll-free telephone numbers and addresses of the major credit reporting agencies if the breach exposed a social security number or a

driver's license or California identification card number;

g.  If the person or business providing the notification was the source of the breach, an offer to provide appropriate identity theft prevention and mitigation services, if any, shall be provided at no cost to the affected person for not less than 12 months along with all information necessary to take advantage of the offer to any person whose information was or may have been breached if the breach exposed or may have exposed personal information.

232.  Defendant failed to provide the legally compliant notice under § 1798.82(d) to Plaintiff and members of the California Subclass. On information and belief, to date, Defendant has not sent written notice of the data breach to all impacted individuals. As a result, Defendant has violated § 1798.82 by not providing legally compliant and timely notice to all California Subclass Members. Because not all members of the class have been notified of the breach, members could have taken action to protect their personal information, but were unable to do so because they were not timely notified of the breach.

233.  On information and belief, many California Subclass Members affected by the breach have not received any notice at all from Defendant in violation of Section 1798.82(d).

234.  As a result of the violations of Cal. Civ. Code § 1798.82, Plaintiff and

California Subclass Members suffered incrementally increased damages separate and distinct from those simply caused by the breaches themselves.

235.   As a direct consequence of the actions as identified above, Plaintiff and California Subclass Members incurred additional losses and suffered further harm to their privacy, including but not limited to economic loss, the loss of control over the use of their identity, increased stress, fear, and anxiety, harm to their constitutional right to privacy, lost time dedicated to the investigation of the breach and effort to cure any resulting harm, the need for future expenses and time dedicated to the recovery and protection of further loss, and privacy injuries associated with having their sensitive personal, financial, and payroll information disclosed, that they would not have otherwise incurred, and are entitled to recover compensatory damages according to proof pursuant to § 1798.84(b).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.   For an Order certifying this action as a class action and appointing Plaintiff and her counsel to represent the Class;

B.   For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from

refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.    For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII compromised during the Data Breach;

D.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i.    Prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.    Requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii.    Requiring Defendant to delete, destroy, and purge the PII of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of

such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.    Requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

v.    Prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vi.    Requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    Requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    Requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix.   Requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.   Requiring Defendant to conduct regular database scanning and securing checks;

xi.   Requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii.   Requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.   Requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as

randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv. Requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. Requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves; and

xvi. Requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvii. for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the

terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment.

E.    For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

F.    Ordering Defendant to pay for not less than ten years of credit monitoring services for Plaintiff and the Class;

G.    For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

H.    For an award of punitive damages, as allowable by law;

I.    For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

J.    Pre- and post-judgment interest on any amounts awarded; and

K.    Such other and further relief as this court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: August 16, 2023

Respectfully submitted,

*s/ John J. Nelson*

John J. Nelson (SBN 317598)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, LLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
Telephone: (858) 209-6941
Email: jnelson@milberg.com

*Attorney for Plaintiff and*
*the Proposed Class*